**DUNCAN FIRM, P.A.**
James H. Bartolomei III
(CA Bar 301678)
Email: james@duncanfirm.com
809 W. 3rd Street
Little Rock, Arkansas 72201
Telephone: (501) 228-7600

**LAW OFFICES OF**
**MICHAEL P. MANAPOL**
Michael P. Manapol, Esq.
P.O. Box 252
Coppell, TX 75019
Email: michael@manapollaw.com
Telephone: 310-467-7283

*Attorneys for Plaintiff RWV LLC*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| RWV LLC,<br><br>                    *Plaintiff,*<br><br>v.<br><br>GAME PLAY NETWORK, INC.,<br>DAVID MARSHALL,<br>RUSSELL FINE, and<br>DOES 1 to 100,<br><br>                    *Defendants.* | **COMPLAINT**<br><br>**1. Declaratory Judgment (Non-Arbitrability; Delegation Unenforceable)**<br>**2. Misappropriation of Trade Secrets (18 U.S.C. § 1836)**<br>**3. Promissory Estoppel**<br>**4. Fraud**<br>**5. Unjust Enrichment**<br>**6. Violation of California's Unfair Competition Laws (Business & Professions Code § 17200, et seq.)**<br>**7. Accounting**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff RWV LLC, for its complaint against Defendants Game Play Network, Inc. (d/b/a Horseplay) ("Horseplay"), David Marshall, and Russell Fine, alleges upon personal knowledge as to its own conduct, and on information and belief based on the investigation of Plaintiff's counsel as to all other conduct alleged herein, as follows.

## I. INTRODUCTION

1.      This action arises from an online casino operator's misappropriation and usurpation of Plaintiff's confidential influencer pipeline and growth playbooks—including the very influencer Plaintiff procured, Jason Boehlke a/k/a

"Mr. Hand Pay"— all the while refusing to pay any compensation.  By exploiting Plaintiff's confidential influencer pipeline and growth playbooks to secure Mr. Hand Pay, Defendants fraudulently usurped the very benefits Plaintiff delivered.

2.      Plaintiff seeks damages and injunctive relief for post-termination misappropriation of its trade secrets (the "Trade Secrets") under the federal Defend Trade Secrets Act ("DTSA"), injunctive relief, estoppel, fraud, violations  and unjust enrichment arising from Defendants' wrongful and deceitful conduct.

3.      Attached is Exhibit "A," the terminated "Influencer Services Agent Agreement" (the "Agreement") which Defendants admit was terminated, with no survival clause for arbitration.

4.      Plaintiff RWV LLC brings causes of action for 1) Declaratory Relief under 18 U.S.C. § 1836; 2) Misappropriation of Trade Secrets (18 U.S.C. § 1836); 3) Promissory Estoppel; 4) Fraud, 5) Quantum Meruit / Unjust Enrichment; 6) Violation of California's Unfair Competition Laws and for 7) Accounting.

## II. PARTIES

5.      Plaintiff RWV LLC ("Plaintiff" or "RWV") is a California limited liability company based in Los Angeles County, California in the District.  RWV's sole member and manager is Robert Vanech ("Vanech"), a California resident. Whenever Vanech is referenced, Vanech was acting on behalf of and for RWV in the scope of his managerial authority and for the benefit of RWV.

6.      Defendant Game Play Network Inc. ("GPN" or "Horseplay") (d/b/a Horseplay) is a Delaware corporation doing business in Los Angeles County and in the State of California. GPN's principal place of business is in this District's Western Division located at 10866 Wilshire Blvd., Suite 700, Los Angeles, California 90024 and can be served at CSC (1505 Corporation) at 2710 Gateway Oaks Drive, Sacramento, California 95833.

7.    Defendant David Marshall ("Marshall") is on information and belief a citizen of California and a resident of the District in Los Angeles County.  Marshall is the CEO and a co-founder of Horseplay.

8.    Defendant Russell Fine ("Fine") is on information and belief a citizen of California and a resident of the District in Los Angeles County.  Fine is President and a co-founder of Horseplay.

9.    GPN/Horseplay, Marshall, and Fine are collectively referred to "Defendants" unless specifically alleged.  All Defendants are jointly and severally liable for their wrongful conduct.

10.    Plaintiff is informed and believes, and thereupon alleges, that at all times mentioned herein, each of the Defendants, including DOES 1 through 100, were the agent, servant, employee, joint venture, subsidiary, investor, partner and/or representative of every other Defendant, and in doing the things hereinafter alleged was acting within the course and scope of such agency, and employment, service, joint venture and/or representation and directed, aided and abetted, authorized and/or ratified each and every act of wrongful conduct hereinafter alleged.

11.    The true names and/or capacities, whether individual, corporate, associate or otherwise of Defendants, DOES 1 through 100, inclusive, are unknown to Plaintiff at this time, and who therefore sues said Defendants by such fictitious names. Plaintiff is informed and believes, and thereupon alleges that each of the Defendants fictitiously named herein as a DOE is legally responsible in some actionable manner, for the events and happenings hereinafter referred to, and thereby legally caused the damages to Plaintiff as hereinafter alleged. Plaintiff will seek leave of court to amend this Complaint to insert the true names and/or capacities of such fictitiously named Defendants once they are ascertained.

12.    At all times herein mentioned, each of the Defendants was the co-tortfeasor of each of the other defendants, acting as the agent, co-conspirator, principal, servant, and/or alter ego of the other.

### III. JURISDICTION AND VENUE

13.     This is a civil action seeking damages based on a federal question under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, pursuant to 28 U.S.C. § 1331.

14.     The Court has supplemental jurisdiction over the remaining state-law claims under 28 U.S.C. § 1367 because the claims form part of the same case and controversy.

15.     Defendant GPN is a Delaware corporation with its principal place of business in Los Angeles County, California. Personal jurisdiction and venue are proper in this District because a substantial part of the events and omissions giving rise to the claims occurred in this District, and GPN transacts business here. *See* 28 U.S.C. § 1391(b).

16.     This District and the Western Division are proper venues under 28 U.S.C. § 1391(c) in that this is the judicial district in which a substantial part of the acts and omissions giving rise to the claims occurred.

17.     The claims alleged also arise out of or relate to Defendant GPN, Marshall and Fine's regular and systematic activities in this District, and the fact that Plaintiff would not have been injured but for Defendants' collective conduct that violated its rights in California.

18.     This Court has *in personam* jurisdiction over Defendants because each availed itself of the privileges of conducting business in this District and the State of California and Defendants incurred benefits from the claims alleged herein, thus it is reasonable for Defendants to submit to the jurisdiction of this California federal district court.

19.     Defendants transact business in this judicial district. Plaintiff's principal place of business is found in this judicial District, and Plaintiff suffered damages in this judicial District caused by Defendants' conduct.

20.    Defendants are subject to the general and specific personal jurisdiction of this Court because of their contacts with the state of California.

21.    Challenges to the arbitration clause are alleged below.

### IV. ALLEGATIONS REGARDING SURVIVAL, NON-ARBITRABILITY, AND EQUITABLE RELIEF

22.    Plaintiff's declaratory relief, trade secrets, fraud, promissory estoppel unjust-enrichment, unfair competition and accounting claims arise from post-termination conduct and from duties independent of any agreement, including statutory duties not to misappropriate trade secrets and common-law duties not to engage in deceit, fraud or unjust enrichment. No claim requires interpretation of, or enforcement under the terminated Agreement, and each claim would be viable even if no contract had ever existed. Accordingly, equitable estoppel does not apply, and the claims are not subject to any arbitration provision in the terminated Agreement.

23.    The terminated Agreement's Survival clause lists specific clauses intended to survive termination—explicitly including confidentiality and accrued payment obligations—but not listing dispute-resolution or arbitration. By its clear terms and structure, the parties did not agree and never intended that arbitration survive termination of the Agreement, especially for the core conduct post-termination.

24.    Notably, the terminated Agreement was drafted by GPN's counsel, Roy Kim, as shown by the metadata of the document.  Further, any ambiguity regarding the meaning of any terms in the terminated Agreement must be construed against the drafter, Defendant GPN and construed in favor of RWV.

25.    On October 24, 2024, GPN admitted to terminating the Agreement.

26.    On October 25, 2024, GPN committed to proceed with finalizing a Mr. Hand Pay agreement and promised to honor compensation terms and pay RWV bounties and an NGR share if the campaign launched, which it did. Mr. Hand Pay signed with GPN in January 2025 and GPN accepted performance and benefits

from RWV. Plaintiff's core claims arise from post-termination misuse of RWV's confidential information and GPN's unfair and unlawful unjust enrichment.

27.    Plaintiff's core claims arise from Defendants' post-termination, and post-termination misuse and misappropriation of Plaintiff's confidential trade secrets—not solely from obligations "arising out of or relating to" the terminated Agreement.

28.    To the extent Defendants contend a delegation clause requires an arbitrator to decide arbitrability, Plaintiff specifically challenges and objects to the delegation provision as procedurally and substantively unconscionable and unenforceable, including because it requires a wet-ink, original physical signature on any demand (purporting to render electronic or copied signatures null and void) and imposes onerous hand/courier delivery mechanics that unreasonably burden and chill access to the forum and conflict with modern practice, all in a one-sided manner to favor GPN. It also contains references to a "Terms of Use" which is not defined in the Agreement anywhere and therefore also fails for vagueness and as ambiguous against the drafter, GPN.

29.    The Agreement's arbitration clause does not apply to conduct that occurred prior to execution of the Agreement or after the Agreement was allegedly terminated on October 24, 2024.

30.    Any arbitration or delegation provision contained in the terminated Agreement does not survive termination based on the plain reading of the terminated Agreement.

31.    After termination, Horseplay, through Marshall and Fine, made new promises to Plaintiff on October 25, 2024 to proceed with securing influencer, Mr. Hand Pay, and to pay Plaintiff for bounties for player sign-ups and net gaming revenue ("NGR") share.

32.    Mr. Hand Pay signed an agreement with Horseplay in January 2025 and Horseplay accepted performance and benefits of Plaintiff's services. However,

GPN, repeating a pattern of deceiving and failing to pay vendors, decided to stiff Plaintiff similarly to at least two other providers of other professional services, conducting itself as just the cost of doing business as a way to receive ill-gotten gains.

33. The terminated Agreement's equitable-relief carve-out authorizes suit in court for injunctive or other equitable relief. Plaintiff seeks such relief here under the DTSA for return/no-use of trade secrets, preservation, and accounting.

34. If the court finds that the Agreement is not terminated, Plaintiff did attempt to invoke the Agreement's 30-day informal negotiation step by sending written notice via email, including an April 17, 2025 letter to GPN from Plaintiff's then counsel and GPN acknowledged receiving the letter. Any further requirements are excused because the Agreement was terminated, procured by fraud, or waived by Defendants' categorical refusal to pay RWV despite accepting the benefits of Plaintiff's performance. The Agreement does not list an "address" for sending notice. Strict compliance is excused by futility, if it were even required to begin with.

35. Plaintiff also seeks an order enjoining any arbitration of these disputes pending the Court's determination of arbitrability.

36. The terminated Agreement's equitable-relief carve-out permits Plaintiff to seek DTSA injunctive relief in this Court such as return/no-use of the Trade Secrets, preservation, and accounting.

37. Separately, enforcement of the delegation/arbitration section of the terminated Agreement would be extremely cost-prohibitive in this dispute given expected forum and neutral fees (JAMS filing and case-management charges plus arbitrator time are likely to exceed $250,000), which could be as much as 50% or more of the value of the controversy. That burden—combined with the wet-ink/hand-delivery prerequisites—chills access to the arbitral forum and is unconscionable.

1    38.    Plaintiff seeks an order enjoining any arbitration pending this Court's

2    determination of arbitrability should this clause be raised in a motion by

3    Defendants.

4    **V.    FACTUAL ALLEGATIONS**

5    39.    RWV is company owned and operated by Vanech, its sole member.

6    40.    RWV provides consulting and contracting services to growth-focused

7    companies, relying on Vanech's access to online influencers and his industry

8    experience and knowledge related to key economic metrics such leveraging his

9    knowhow with "customer acquisition costs," otherwise known as "CAC" and

10    lifetime value ("LTV").  These two key economic metrics are critical for growth

11    companies to understand and value how much it costs to acquire a customer (or

12    player), and the value of the customer/player for a company over the lifetime of that

13    customer.  The lower a company acquires a customer (compared to its peers), the

14    more profits a company has the potential to earn.

15    41.    Vanech is a Los Angeles-based entrepreneur and consultant with

16    nearly three decades of C-suite level experience in fast-growth, high-energy,

17    disruptive and change-oriented companies where he has developed proprietary

18    CAC and LTV data models that he uses, amongst other things, matching online

19    influencers with niche companies such as Horseplay who needed to acquire new

20    players to grow and maintain revenue.

21    42.    Vanech has extensive operating, finance, sales and business

22    development experience in the technology, digital media, gaming, entertainment,

23    sports, music and mobile application sectors. He has been a chairman of boards of

24    directors, CEO and CFO of venture-backed private companies, wherein he led

25    finance, corporate development, sales, revenue, capital raising and venture

26    investment efforts.

27    43.    Vanech also has significant experience as a founder of joint ventures,

28    having raised over $250,000,000 for companies with which he was a founder of or

served as a C-suite level executive. Historically, Plaintiff's job responsibilities have included managing mergers and acquisitions, debt and equity financing, due diligence, investor relations, sales, and legal and personnel management using outside counsel to ensure good corporate hygiene, including both public and privately financed companies.

44.    Defendant GPN (d/b/a Horseplay) is online gaming and casino slots company that legally operates in 18 U.S. states. According to its website, "Horseplay is a mobile games community that lets you legally Wager & Win real cash in the US. With $1,000s at stake, each wager is infused with live horse racing to determine your payouts. That's right, the Sport of Kings. Headquartered in Los Angeles, Horseplay is US legal, authorized to conduct online horse wagering pursuant to state licenses and the federal Interstate Horseracing Act."[1]

45.    In August 2024, GPN, Marshall and Fine sought to grow GPN's online gaming business and explore new methods to acquire new players at a lower cost. At Vanech's advice, one method involved engaging high-profile digital YouTube influencers to promote Horseplay and drive new player signups, all for less CAC than the methods GPN was using.

46.    RWV, through Vanech, reached an agreement in principle to work with Horseplay and offered to cultivate Vanech's confidential relationships, influencer pipelines, and Trade Secrets by matching Horseplay with casino influencers, digital affiliates and other methods to acquire users, who were vetted and ready to enter into deals.  In addition, and informally through Vanech's investor network, Vanech made introductions to prospective investors in GPN which needed capital to grow.  Vanech delivered on both fronts.[2]

---

[1] https://www.horseplay.com/en/about-us

[2] While Vanech sourced a finance company to help fund Horseplay's expansion, he never sought nor expected compensation for this service, as he made known neither RWV nor Vanech are broker/dealers. However, this demonstrates that Vanech's incentives were positively aligned with Horseplay's upward growth and success.

47.     One of RWV's priority targets was prominent gaming YouTuber Jason Boehlke a/k/a "Mr. Hand Pay,"[3] a casino and slots gambler that RWV and Vanech helped grow from 500,000 YouTube subscribers to over 1 million YouTube subscribers.  Mr. Hand Pay has strived to earn a reputation as an industry leader known for advocating more transparency in the digital slots and gaming space which has garnered him a loyal following of slots players, something online casinos covet to help grow their active players.[4]

48.     Vanech had developed a relationship with Mr. Boehlke based on his trust and industry experience in growing brands and Vanech's proprietary understanding and track record of CAC and LTV and the nascent casino influencer space. Only over the past few years were the casinos just starting to permit influencers to video and promote their actual real game play, which had historically not been permitted in brick-and-mortar casinos.

49.     Vanech, through RWV, also offered to share valuable and proprietary trade secrets about CAC metrics, creative ways to lower CAC to acquire customers, confidential influencer customer list(s) and contact information that he had learned over the course of nearly a decade in this industry.

50.     Since 2018 as both a consultant and employee, Vanech has led growth efforts at Trebel Music, a music app which grew nearly 60-fold from under 100,000 users to over 30 million while driving revenues from less than $100,000 to what is now $20,000,000 in annual revenue for this business. GPN wanted this know-how and rolodex from Vanech, but Vanech needed to be paid for this knowledge, experience, services, time and effort to access this information and make it useful for GPN.

///

---

[3] https://www.mrhandpay.com/AboutUs
[4] https://www.youtube.com/watch?v=F-tB6KhtyZo ("The TRUTH, the Whole TRUTH, and Nothing but the TRUTH...) which was posted recently and appears to be a direct message to the online gaming world, including Horseplay.

51.     At the outset that RWV started dialoguing with GPN about its CAC, GPN was substantially overspending, often spending well over $100 to acquire a new customer.

52.     RWV offered to help decrease GPN's CAC formula to help it improve its operating costs. Simultaneously, Vanech (by securing users for GPN from the casino influencer fan bases) would also be expected to generate better LTV and create recurring revenue streams for GPN. Vanech needed to be paid for this know-how and access to this information.

53.     There is no dispute that RWV and GPN entered into the Agreement on October 1, 2024 to compensate RWV for delivering gaming and slots YouTube influencer, Mr. Hand Pay ("Agent [RWV] shall obtain written agreement by Influencer to promote GPN's Products through direct commentary and publication of pre-approved creative via their social channels.").

54.     As GPN admits, GPN and Mr. Hand Pay signed an influencer agreement in January 2025 that triggered compensation that GPN owed to Plaintiff for Plaintiff's services. To date, GPN refuses to pay Plaintiff even though it as admitted it owes Plaintiff compensation for its efforts.

55.     In one breath, Marshall admitted that GPN owed RWV compensation, but in another GPN's lawyers threatened to sue Vanech in an effort to silence him and prevent the public from knowing about GPN, Marshall and Fine's wrongful conduct.

56.     However, GPN and its principals, Marshall and Fine, and prior to execution of the Agreement, never intended to honor the compensation terms of the Agreement because GPN, Marshall and Fine procured the Agreement (and the fruits of RWV's efforts) via fraud.

57.     As background facts, GPN and its principals, Marshall and Fine, fraudulently induced RWV into executing the Agreement based on Defendants'

false promises that it would pay RWV based on Qualified Players delivered by the Influencers as determined by the link or code provided by GPN:

      i.     For each Qualified Player as defined herein, Agent receives a bounty of $37.50.

      ii.    15% of the NGR that Qualified Player generates in its first 365 calendar days of engagement with GPN, beginning on the day that Qualified Player is approved to play.

      iii.   10% of the NGR generated in the second 365 calendar days of the Qualified Player's engagement with GPN (days 366-730).

See Ex. A at p. 6.

58.    As further background facts, GPN was also required to compensate RWV with a marketing fee: "9. Marketing Fee. For each influencer signed by Company, a $5,000 marketing fee will be paid for services to RWV, LLC, its designee of choice, or to the influencer within 15 days of contract signing to enable promotion and marketing of Company services. *Id.* at 7.

59.    RWV relied on Defendants' false promises to its detriment, including communicating and sharing confidential trade secrets only Vanech knew about regarding Mr. Hand Pay and what it would take secure an agreement, his private contact information, Mr. Hand Pay's growth plans, capital-raising plans, legal contact, marketing strategies, some of which originated by Vanech and most of which were Vanech's private and confidential knowledge.

60.    Vanech shared that Mr. Hand Pay was negotiating a deal (devised by Vanech) to receive additional funding through the fractional sale of his YouTube Channel to boost his brand which would directly benefit Horseplay with access to hundreds of thousands of Mr. Hand Pay's new YouTube subscribers and invariably convert to Horseplay users, plus Vanech's knowledge and processes about CAC and LTV that would benefit Mr. Hand Pay and Horseplay.

61.     However, it is clear that Defendants never intended to honor the compensation terms of the Agreement whenever GPN executed an agreement with Mr. Hand Pay (whether it be one day after RWV signed the Agreement or three months later) because GPN, through Marshall and Fine, knew (and hid from from RWV and Vanech) that the Agreement would cost Defendants more than they would ever be willingly to pay, short of a court order or objective legal counsel advising them that likely committed fraud in the inducement.

62.     GPN admitted RWV's compensation terms were "too rich" a mere 24 days after the Agreement was signed and no jury or court could reasonably find that termination was justified based on a surprise or mistake when Mr. Hand Pay was on the precipice of a deal with GPN.  Once GPN got what it wanted through a bait-and-switch, it dishonestly and unfairly terminated the Agreement.

63.     In other words, Marshall and Fine fraudulently induced RWV and Vanech with promises to pay cash based on the only deliverable RWV was required to perform: "**5. <u>Deliverables.</u> Agent shall obtain written agreement by Influencer to promote GPN's Products through direct commentary and publication of pre-approved creative via their social channels**" (see Ex. A at 7), and RWV relied on these promises to its detriment.

64.     Not only did RWV deliver on its primary deliverable, but the terms with Mr. Hand Pay were substantially negotiated and pre-approved by GPN, *prior to* Vanech and GPN finalizing the RWV/GPN Agreement as demonstrated by admissions made by Fine's texts to Vanech.

65.     GPN admitted that RWV's primary deliverable was performed: signing Mr. Hand Pay who delivered thousands of player signs ups and on information and belief, possibly millions in LTV revenue to Horseplay.  Whatever compensation terms GPN had with Mr. Hand Pay were never tied to how RWV was to be compensated.

66.    GPN went from agreeing to pay out a bounty and tail under its then current CAC to get squeezing RWV of the mix and getting its CAC to $0 cash out-of-pocket and warrants only (equity) to Mr. Hand Pay.

67.    On or about October 1, 2024, and after several weeks of negotiations with Vanech, GPN executed the Agreement with RWV which required RWV to source and secure a written agreement with influencers, specifically referencing Mr. Hand Pay in the Agreement, to promote GPN, in exchange for the above-described compensation.

68.    During this time, the general economics of the Mr. Hand Pay deal was known to all parties, and substantially managed with Vanech serving as the primary intermediary between all parties and their counsel.

69.    Contemporaneous communications from GPN acknowledged the Agreement was "signed and done," with RWV celebrating the Agreement as akin to being "partners," and Marshall asking how to "get traffic/users started" from Mr. Hand Pay, knowing that Vanech has marketing ideas, access to capital, and resources to help both Mr. Hand Pay and GPN grow together.

70.    By October 2024, RWV had advanced discussions, an in-person meeting, and handoffs among legal counsel to finalize an influencer agreement between GPN and Mr. Hand Pay.  However, prior to signing the Agreement, Marshall and Fine, who controlled GPN, never intended to honor the Agreement that they had fraudulently induced RWV to sign because they always believed and knew that they could simply terminate Agreement any time and blame that the compensation was too costly and "rich" for GPN, even after they got what they sought: a Mr. Hand Pay deal.

71.    In other words, GPN knew that the terms of the Agreement – before it was executed on October 1, 2024 – were never going to be honored by GPN but made the promises to RWV anyway with the intent that RWV and Vanech rely on the promises to RWV's detriment.

72.     On October 24, 2024, GPN, through Fine, abruptly emailed Vanech, 24 days after the Agreement was executed, "At this point, I don't think we can continue the conversations with Mr. Hand Pay, and are terminating our agreement."

73.     Despite the vagueness of what may have been terminated, Vanech contact GPN via phone and email to discuss "not giving up" on Mr. Hand Pay with a presumption that RWV would be compensated and GPN honor its word.

74.     The very next day in an about-face on October 25, 2024, Fine emailed Vanech that GPN still wanted to "launch a campaign with Mr. Handpay [sic]," that it would "honor these deals," and that "We will pay any bounties due … and NGR share to you."  This communication represented another false promise that Fine, Marshall and GPN never intended to fulfill and at the same time reasonably expected RWV and Vanech to rely on and continue pursuing a deal with Mr. Hand Pay.

75.     Throughout November and December 2024, GPN and Mr. Hand Pay continued negotiating and preparing a launch with Horseplay, with RWV regularly checking in on the progress and providing Mr. Hand Pay feedback, encouragement, and ultimately access contacts with growth capital.  Vanech still fully expected that GPN would stand by its promises and pay RWV.  During this time RWV proceeded to arrange financing for Mr. Hand Pay, which in 2025 resulted in $2.6 million to allow Mr. Hand Pay to staff and grow his audience, which has also been of great benefit to GPN.

76.     GPN intentionally slowed execution of an agreement with Mr. Hand Pay to create "distance" with the termination of the Agreement all the while relying on RWV's continuing efforts, know-how and trade secrets RWV shared via Vanech.

77.     So long as GPN could delay negotiations with Mr. Hand Pay after GPN terminated the Agreement with Plaintiff, it is likely that GPN treated this delay as an opportunity as a fraudulent and bad faith excuse to avoid having to

compensate RVW under the guise that timing was a legitimate reason preventing a deal from getting done with Mr. Hand Pay that wasn't "too rich" for GPN on what it needed to pay RWV.

78.     In January 2025, GPN and Mr. Hand Pay executed an influencer agreement (the "Hand Pay Agreement") based on efforts and RWV's participation.

79.     RWV has never seen, nor does it have a copy of the Hand Pay Agreement despite demanding such,

80.     Shortly after execution of the Hand Pay Agreement, GPN reported to Vanech that Mr. Hand Pay was responsible for sourcing roughly 900 new players in nine (9) days—"not a bad start."  But still no payment was made to RWV.

81.     As additional supporting background evidence, GPN also usurped Vanech's marketing tactic to create a Mr. Hand Pay token (a large coin that GPN and Mr. Hand Pay could use to promote Horseplay), which was a novel idea that RWV shared to boost the strategic sponsorship.

82.     Vanech previously arranged a meeting between GPN executives and Mr. Hand Pay in Las Vegas at Vanech's expense in October 2024, when Mr. Hand Pay gave away Mr. Hand Pay coins to the GPN team. At that meeting, Vanech suggested that at some point after a deal was signed, they should create a two-sided custom coin that would include a co-branded message with Mr. Hand Pay and Horseplay. This was ultimately a tactic deployed in 2025 by Horseplay.  This novel concept is another example of GPN taking RWV's Trade Secret and using it to its advantage without compensating RWV.

83.     Despite RWV's role in sourcing and securing Mr. Hand Pay, GPN refused to pay RWV for its services, reasonably valued as per-player bounties worth $37.50 or any of the NGR share. Instead, GPN, refusing to pay any cash, offered only future out-of-the-money warrants as a pyrrhic substitute for cash compensation, which RWV rejected.

84.     Despite demanding an accounting, RWV does not have access to the total number of players that signed up to use Horseplay via Mr. Hand Pay, but estimates that this number is likely close to or above 10,000 players at this time, representing at least the reasonable valuable of services of $375,000 in bounty compensation owed to RWV for the sign-up fees, as of the date of this filing.

85.     Despite demanding an accounting, RWV does not have access to the NGR share to date based on player revenue sourced by players via Mr. Hand Pay, but estimates that assuming at least 90% players (9,000) deposited a net total of $100. This loss represents the reasonable value of services and is a basis for at least another $135,000 of commissions owed to RWV connected to the estimated NGR collected by GPN at the 15% payout rate.  Assuming some players made second deposits, that number will be substantially larger. And in the second year, another 10% of wagered bets would be owed to RWV as a reasonable amount of compensation owed for GPN's unjust enrichment.

86.     Beyond Mr. Hand Pay, RWV also identified, pitched, and developed other confidential targets that he shared with GPN—including "Jackpot Beauties"/Ariana—and shared with GPN strategy, contact information, pricing and compensation benchmarks, conversion tactics, and pipeline status developed at RWV's expense and kept confidential.

87.     RWV has learned that GPN recently approached "Jackpot Beauties"/Ariana directly without compensating RWV and hoping that RWV would not discover this end-around. The Ariana/"Jackpot Beauties" outreach used RWV's nonpublic contacts and price points; and that GPN repurposed RWV's conversion scripts and CAC/LTV tactics.

88.     Plaintiff also shared nonpublic investor intelligence, fundraising leads, and operational advice (e.g., cost-per-acquisition improvements), and introduced competing debt financiers that made a loan offer that resulted in GPN raising approximately $7 million, albeit from a different source. Plaintiff disclosed this

information and assistance for the limited purpose of advancing the parties' relationship and without any expectation of compensation, but simply confidentiality, not for GPN to misappropriate these trade secrets for its benefit.

89.    Recently at the 2025 VidCon annual YouTube conference, on a stage secured by a company event where Vanech is now a part owner of that company, and in front of a standing-room-only crowd, Mr. Hand Pay publicly acknowledged that Vanech ("Bob") was responsible for his introduction to Horseplay, also noting Vanech's involvement as GigaStar (also introduced by Vanech) had recently raised $1.3 million for Mr. Hand Pay's company and brand.[5]

90.    Vanech told Marshall of the plans for Mr. Hand Pay to conduct this capital raise before it was raised via phone call and text, which is also likely a Trade Secret that GPN misappropriated and benefited from.

91.    Mr. Hand Pay's public acknowledgement was captured on video and confirms that RWV and Vanech were the catalyst for making the Mr. Hand Pay/GPN relationship what it is. Mr. Hand Pay (Mr. Boehlke) will testify truthfully to this fact as he has built a brand and relationship with his casino enthusiasts based on honesty, trust and integrity.

92.    Plaintiff took reasonable measures to maintain the secrecy and value of its influencer pipeline data, contact lists, negotiation playbooks, pricing models, and investor leads, including limiting access, protecting devices and its accounts by password, and sharing sensitive information only with GPN executives in connection with the contemplated deals. These reasonable measures specifically include limited recipients (Marshall/Fine only), and requests from Vanech that this information not be shared publicly.  RWV made no public disclosure.

---

[5] The full YouTube video can be viewed here: https://youtu.be/aLH5CwS3xG4?si=6fD3gSsRBWnk4R8N&t=897 with the relevant portion starting at 14:58.

93.     After termination, Defendants used RWV's nonpublic contacts and price points to solicit Ariana/"Jackpot Beauties", and repurposed RWV's creator-specific conversion scripts and CAC reduction tactics in the Mr. Hand Pay campaign without compensating RWV.

94.     RWV's trade secrets include nonpublic influencer identities and direct contacts; pipeline lists with status, pricing, and negotiation paths; creator-specific conversion scripts and CAC/LTV models; and investor leads/analyses, the Trade Secrets. RWV maintained these in password-protected, folders labelled "Confidential," shared only with Marshall and Fine on a need-to-know basis; RWV did not publicly disclose them.

95.     Post-termination of the Agreement, Defendants used RWV's Trade Secrets without consent to solicit and structure deals with Mr. Hand Pay and other targets (including "Jackpot Beauties"/Ariana) and to deploy RWV's CAC-reduction tactics, while refusing to compensate RWV.

96.     The foregoing confidential information derives independent economic value from not being generally known and not being readily ascertainable to the public to GPN. This information clearly relates to interstate commerce and competitive positioning in the national online gaming and digital-media markets that now rely on influencers to boost brand awareness and player sign-ups.

97.     After reaping the benefits of RWV's efforts, services, Trade Secrets and know-how—including the Hand Pay Agreement and the resulting influx of player sign-ups with Horseplay—GPN refused to pay RWV and continued to use RWV's confidential Trade Secrets to pursue additional influencer deals, unjustly enriching itself at the detriment of Plaintiff.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Declaratory Judgment (28 U.S.C. §§ 2201–2202)

### (Non-Arbitrability; Delegation Unenforceable)

1

**(Against All Defendants)**

2       98.    Plaintiff repeats and realleges each and every allegation set forth in the

3   preceding paragraphs of this Complaint.

4       99.    An actual, present controversy exists concerning whether Plaintiff's

5   claims must be arbitrated and whether any delegation clause requires an arbitrator,

6   rather than this Court, to decide arbitrability.

7       100.   Because Plaintiff's DTSA claim establishes federal-question

8   jurisdiction, and because both the DTSA and California law authorize constructive

9   trust as an equitable adjunct to trade-secret remedies, Plaintiff respectfully requests

10  that the Court impose a constructive trust over all profits, revenues, and property

11  traceable to Defendants' misappropriation, in addition to granting statutory and

12  injunctive relief.  See § 1836(b)(3)(A)(ii).

13      101.   The Agreement was allegedly terminated, and its Survival clause does

14  not mention, list, or specifically describe dispute-resolution/arbitration among the

15  specific and identifiable provisions intended to survive as drafted by GPN.

16      102.   GPN and RWV did not specifically agree that arbitration would

17  survive termination for any claims, especially in light because the Agreement was

18  procured by fraud.

19      103.   Plaintiff's principal claims arise from post-termination conduct,

20  including a post-termination promise and post-termination misuse of RWV's Trade

21  Secrets, and therefore fall outside any arbitration obligation in the terminated

22  Agreement.

23      104.   Separately and additionally, any delegation provision is unenforceable

24  due to procedural and substantive unconscionability, including the wet-ink

25  original-signature and hand/courier-delivery requirements that render electronic

26  signatures null and void and unreasonably burden access to the forum, which is also

27  one-sided as to RWV only and not as to GPN.

28

105.   Neither Defendant Fine nor Defendant Marshall, as individuals, are signatories to the terminated Agreement and each cannot compel arbitration because Plaintiff is not relying on the Agreement to prove any claims, as the Agreement is background information related to the underlying causes of action.

106.   Plaintiff seeks a declaratory judgment that the arbitration provision of the terminated Agreement did not survive termination and does not apply to this matter, or alternatively that Plaintiff's claims fall outside its scope; that any delegation is unenforceable, was void or voidable; and that Plaintiff may proceed in this Court, including for DTSA injunctive and other equitable relief under the DTSA and California law as alleged herein.

**SECOND CAUSE OF ACTION**

**(Misappropriation of Trade Secrets – 18 U.S.C. § 1836, et seq.)**

**(Against All Defendants)**

107.   Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs of this Complaint.

108.   RWV owns valid Trade Secrets.

109.   Each of RWV's Trade Secrets relates to services used in, or intended for use in, interstate or foreign commerce.  Use or intended use of the product or service in interstate commerce means that the product or service involves travel, trade, transportation, or communication between a place in one state and a place in another state, such as how Mr. Hand Pay, Horseplay and GPN's players interact.

110.   Plaintiff refers to the Trade Secrets to include but not limited to nonpublic influencer identities and contact information, curated pipeline lists, negotiation strategies and compensation structures for CACs (including an October 8, 2024 training call with Karla Ilarde, GPN's then Director of Marketing about CAC, user acquisition techniques, CAC/LTV ratio strategy and specific formulas to drive down costs to increase profitability), conversion and growth tactics that were influencer specific, fundraising initiatives and plan by the influencers developed

and created by RWV, and investor leads and analyses of each including Mr. Hand Pay and Jackpot Beauties/Ariana.

111.   A trade secret may take many forms, including all forms and types of financial plans and data, business, scientific, technical, economic, or engineering information.  A trade secret may also include patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes.  A trade secret may be tangible or intangible.  A trade secret does not have to be stored, compiled, or memorialized.  But if it is, it does not have to be stored, compiled, or memorialized in any particular manner, such as physically, electronically, graphically, photographically, or in writing.  *See* 18 U.S.C. § 1839, *et seq*. (definitions)

112.   RWV's Trade Secrets are not generally known to another person who can obtain economic value from the disclosure or use of the information.

113.   Another person cannot readily discover the Trade Secrets through proper means.

114.   RWV claims that all Defendants acquired, disclosed, misappropriated or used the Trade Secrets without the right to do so and were acquired via fraud. This is called "misappropriation."

115.   RWV can prove that all Defendants misappropriated the Trade Secrets because all Defendants acquired, disclosed, or used the Trade Secrets without RWV's express or implied consent (which consent required compensation); and all Defendants knew or should have known that the Trade Secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the Trade Secrets or not exploit the use of Trade Secrets without agreement or compensation.

116.   "Improper means" may include, but are not limited to, theft, bribery, misrepresentation, fraud, breach or inducement of a breach of duty to maintain secrecy.   *See* 18 U.S.C. § 1839, *et seq*. (definitions).

117.   Each act of acquiring, disclosing, or using the Trade Secrets may constitute a separate act of misappropriation.

118.   The Trade Secrets derive independent economic value, actual or potential, from not being known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information and RWV has taken reasonable steps to keep its Trade Secrets private and secret from the public.

119.   Plaintiffs took reasonable measures to keep the Trade Secrets secret and to limit their disclosure to GPN executives solely for the purpose of consummating influencer agreements and related growth of player acquisition and revenue generation.

120.   GPN misappropriated the Trade Secrets by acquiring them under circumstances giving rise to a duty to maintain secrecy and limit use, and by using them without consent to solicit influencers (including those first sourced by RWV) and to structure deals while refusing to compensate RWV.

121.   The misappropriation of Trade Secrets under 18 U.S.C. § 1836, *et seq* violated Plaintiff's rights and caused damages, requiring compensation and injunctive relief.

122.   The Trade Secrets relate to services used in, and intended for use in, interstate commerce as GPN operates in 18 states with players in each of those states.

123.   GPN's misappropriation of the Trade Secrets has caused, and will continue to cause, irreparable harm and monetary damages to Plaintiff.

124.   GPN's misappropriation was willful and malicious, entitling Plaintiff to exemplary damages and attorneys' fees under 18 U.S.C. § 1836(b)(3) for conduct before, during and/or after the Agreement was allegedly terminated.

125.   Plaintiff is entitled to injunctive relief and other equitable relief to prevent any further use or disclosure of the Trade Secrets, an order compelling their

return/destruction, damages for actual losses and unjust enrichment, an order establishing a constructive trust over all profits, revenues, and property traceable to Defendants' misappropriation, exemplary damages, and reasonable attorneys' fees to be determined at trial.

126.   Defendants' conduct has caused, and any continued conduct will continue to cause, irreparable injury to Plaintiff, unless enjoined by this Court.

127.   Therefore, Plaintiff has no adequate remedy at law. Pursuant to 18 U.S.C. § 1836, *et seq,* Plaintiff is entitled to a permanent injunction by the Defendants and all persons acting in concert with the Defendants.

128.   Plaintiff seeks permanent injunctive relief in this Court under 18 U.S.C. § 1836(b)(3), including orders prohibiting use/disclosure of trade secrets and mandating return/destruction and preservation, as authorized both by the DTSA.

129.   In addition to statutory remedies and injunctive relie,f Plaintiff also seeks other appropriate equitable relief pursuant to 18 U.S.C. § 1836(b)(3)(A) and California law, including but not limited to, an order establishing a constructive trust over all profits, revenues, and property traceable to Defendants' misappropriation.

130.   Defendants are jointly and severally liable for the misappropriation of trade secrets and damages caused to Plaintiff resulting therefrom in an amount to be proven at trial.

### THIRD CAUSE OF ACTION

### (Promissory Estoppel)

### (Against All Defendants)

131.   Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs of this Complaint.

132.   To prove a claim for promissory estoppel, Plaintiff can prove (1) promises clear and unambiguous in its terms by Defendants; (2) reliance by Plaintiff to who the promises were made; (3) reliance by Plaintiff was both

reasonable and foreseeable; and (4) Plaintiff was damaged by its reliance of the promises made by GPN, Marshall and Fine.

133.   As is specifically plead in the factual allegations and incorporated here, Plaintiff has plead the "how, when, where, to whom, and by what means the [fraudulent] representations were tendered" against Plaintiff.  For avoidance of doubt, Plaintiff summarizes some of the key factual allegations for its promissory estoppel claim in addition what has been plead above.

134.   On August 23, 2024, Marshall met in person with Vanech at the Casa Del Mar hotel in Santa Monica, California, where Marshall shared what GPN needed and that it was willing to compensate Vanech and his company, RWV, for the right introductions.  Marshall followed up the meeting with a text to Vanech:

> "Great spending time. I've been trying to figure out what to say to Russell…. **"You can drive customers at a fraction of our current CAC".** He will ask how…. Thinking, if we can get a few $ in quickly from your first guys in NY, lets carve some out for a marketing spend with you."

135.   In other words, Marshall promised to get Vanech compensated with cash from GPN because Vanech in turn promised to drive customers at a fraction of Horseplay's current CAC.

136.   Throughout September 2024, Vanech continued to negotiate in good faith with Marshall and Fine to secure a meeting with Mr. Hand Pay and consummate an agreement for GPN, with Fine and/or Marshall communicating via text, Zoom (some were recorded) or on phone calls.

137.   Prior to signing the terminated Agreement on October 1, 2024, Marshall and Fine, who control and manage GPN as its CEO and President, each acting for his own benefit respectively and for the benefit of GPN, never intended to honor the terms of the Agreement and conspired to fraudulently induced Vanech to sign on behalf of RWV.  Why? Because Marshall and Fine knew throughout negotiations (and later admitted in writing via email) that the compensation terms

of the Agreement were too costly, too "rich" for GPN and not something they would pay. This fact was known to each of them, especially Fine, as early as late August 2024 and throughout September 2024.

138.   Specifically, certain specific commercial terms were shared by Fine after Vanech and Marshall agreed in principle to find ways to work together to help acquire users, Fine wrote: "we will do 100 Cash to hand pay and 15 percent of ngr to you, plus the 100k warrant agreement on the terms I described."  All along, in person with Marshall and again on calls with Fine, Vanech made it clear that any deal he would have to accept for RWV, as required by Vanech's spouse, must include some cash and not equity only (warrants).

139.   On or about September 9, 2024, about 3 weeks before execution of the Agreement, and with momentum on the Mr. Hand Pay engagement, RWV and GPN had reached a deal in principle with the terms sent over in email later than month.  GPN agreed to compensate RWV with $37.50 per qualified player sign up (cash) for each player sourced from Mr. Hand Pay, plus 15% of the first year of net gaming revenue (cash) and 10% in year two (cash).  At that time, GPN, through Fine and Marshall, knew the deal terms that formed the basis of the Agreement would never be honored and were inducing Plaintiff with these material terms so that Plaintiff would rely on such promises and continue to encourage and advise Mr. Hand Pay to sign an agreement with GPN, which was a prerequisite for RWV to be compensated.

140.   On or about September 18, 2024, GPN received and acknowledged a summary of terms from RWV that formed the basic terms of the Agreement.  Yet, GPN, Marshall and/or Fine had no intent to honor those terms at this point.

141.   On September 30, 2024, Vanech text Fine confirming "Please make sure we have my [RWV] deal done by then..and I will send an agenda [for Mr. Hand Pay.]"

142.   On October 1, 2024, GPN, Fine and Marshall knew that RWV needed a signed agreement to proceed with pursuing Mr. Hand Pay, and that day, GPN, through its counsel finalized the Agreement draft as the drafter.  Vanech signed the Agreement for RWV and Fine signed the Agreement for GPN.

143.   But what RWV and Vanech did not know throughout negotiations was that GPN knew that the terms of the Agreement – before it was ever executed on October 1, 2024 – were never going to be honored by GPN, and through Fine and Marshal, made oral and written promises to RWV with the intent that RWV and Vanech reasonably rely on the promises to RWV's detriment.

144.   On or about October 9, 2024, Vanech secured an in-person meeting with Mr. Hand Pay, Vanech, Tod Lower (GPN's COO) and Marshall (for GPN) in Las Vegas to discuss how Mr. Hand Pay's deal could benefit GPN and vice versa.

145.   On or about October 25, 2024, despite a "termination" email of the Agreement, GPN unequivocally promised RWV that if the campaign proceeded and an agreement was executed with Mr. Hand Pay, it would honor the deal with RWV and pay RWV bounties and an NGR share. GPN expected and intended RWV to rely on these fraudulent promises.

146.   On October 31, 2024, Fine texted Vanech to confirm that GPN was still pursuing an agreement with Mr. Hand Pay despite GPN's vague termination of the Agreement with RWV, which could be construed as a waiver of the termination. Fine texted: "I reworked it [agreement terms] with them [Mr. Hand Pay and his lawyers] to a large equity based deal and we [GPN] are trying to get it through lawyers now. I will keep you informed when there is progress." Why make this representation if Fine and GPN never intended to compensate RWV or if in fact GPN terminated the Agreement?  To keep RWV working to close Mr. Hand Pay, which eventually happened in January 2025. Plus, RWV never agreed to proceed rendering services under the Agreement, which primarily consisted of facilitating a

written influencer agreement between Mr. Hand Pay and GPN, without being paid the cash it was owed.

147.    Consistent with a pattern and practice of inducing vendors such as RWV to perform services and getting those vendors to perform, and then refusing to pay for their services, what happened to RWV is not the first time Fine, Marshall and GPN duped a company into signing an agreement that GPN never intended to perform, which is evidence of GPN's course of conduct.

148.    On information and belief based on public records, the following cases demonstrate a pattern and practice by Defendants:

    a.  *Jacobson et. al. v. Riahl and Game Play Network Inc.*, June 20, 2016, Los Angeles Super. Ct. BC624313 (Plaintiffs alleged fraud, violation of trade secrets, etc.);

    b.  *Creditors Adjustment Bureau, Inc v. Game Play Network, Inc.,* March 10, 2025, CA Orange Super. Ct.30-2025-01465601 (allegations that Defendants wrongfully refused to pay an employment recruiter $245,716 for services) and

    c.  *Emerald Group Inc.* v. *Game Play Network, Inc.,* November 20, 2024, Marion Oregon Cir. Ct. 24CV55176 (alleging Defendants wrongfully refused to pay an employment agency $14,305 for services rendered).

149.    Discovery will likely reveal more claims that were filed in court and/or settled without litigation that show a pattern and practice of GPN, Fine and/or Marshall, willfully violating contracts with GPN's vendors and contractors by refusing to pay them for services rendered thereunder and misappropriating their trade secrets and other confidential information disclosed to GPN before it materially breached the contract.

150.    RWV reasonably and foreseeably relied on the promises to be paid by continuing efforts to secure Mr. Hand Pay for GPN and supporting a launch,

conferring substantial benefits on GPN. Injustice can be avoided only by enforcing GPN's promise and awarding reliance/expectation damages.

151.   Defendants are jointly and severally liable for promissory estoppel and the damages caused to Plaintiff.

## FOURTH CAUSE OF ACTION

### (Fraud / Intentional Misrepresentation / Promissory Fraud)

### (Against All Defendants)

152.   Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

153.   To prove a claim for fraud/misrepresentation, Plaintiff can prove that (1) Defendants made misrepresentations as alleged herein; (2) Defendants knew that the representations were false at the time those communications were made; (3) Defendants intended to induce Plaintiff to rely on the misrepresentations; (4) Plaintiff justifiably relied on the misrepresentations; and (5) the misrepresentations caused Plaintiff damages.

154.   Plaintiff alleges the following facts with particularity:

    a.   On October 1, 2024, Vanech texted Marshall that the Agreement was "signed and done," and "Congrats. We are partners," which confirmed that RWV was induced and continued performance.

    b.   On October 24, 2024, Fine emailed Vanech that GPN was terminating the Agreement, citing the compensation was "too rich."

    c.   On October 25, 2024, Fine emailed that GPN would still proceed with launching with Mr. Hand Pay, would honor RWV's deal, and would pay bounties due and an NGR share to RWV if the campaign proceeded.

    d.   On October 31, 2024, Fine texted Vanech that he had reworked terms with Mr. Hand Pay's counsel to a large equity-based deal and would keep RWV informed—further inducing RWV to continue its efforts.

e.   In January 2025, after Mr. Hand Pay signed an agreement with GPN based on RWV's services, Fine texted Vanech and Marshall on a group text that "about [new] 900 players in 9 days," yet refused to pay RWV and instead proposed only near-worthless warrants which were not a fair or comparable substitute for cash payments.

155.   Within 24 days of execution of the Agreement, GPN declared the economics were "too rich," evidencing lack of present intent to perform when promising to "honor these deals" and pay RWV's share.

156.   GPN made specific misrepresentations—including that the agent deal was "signed and done," and that GPN would "honor these deals" and pay RWV an NGR share if the campaign launched—that were false when made or made without intent to perform.

157.   The Agreement, which provides the baseline roadmap for damages, even if terminated, cannot be enforced as to eliminating "punitive (or exemplary) damages" clause for intentional misconduct or statutory violations. California *Civil Code §1668* makes clauses that exempt a party from responsibility for fraud, willful injury, or violation of law void as against public policy.

158.   In 2025, the California Supreme Court confirmed that §1668 bars not only complete exculpation but also limitations on damages for willful wrongs—so contractual caps/waivers cannot legally cut off punitive or exemplary remedies for torts or statutory claims, thus making this clause void.

159.   GPN further misled Plaintiff by adding extra-contractual conditions, delaying execution of an agreement with Mr. Hand Pay until 2025 while benefiting from RWV's efforts, Trade Secrets and services, and then refusing to pay Plaintiff after obtaining Mr. Hand Pay's signature and performance.

160.   Plaintiff reasonably relied on GPN's statements (through Marshall and Fine) to its detriment. Defendants acted with fraud, oppression, or malice, entitling Plaintiff to compensatory and punitive damages in an amount to be proven at trial.

1    161.   Defendants are jointly and severally liable for the fraud they engaged

2    in and the damages caused to Plaintiff.

3                          **FIFTH CAUSE OF ACTION**

4                  **(Quantum Meruit / Unjust Enrichment)**

5                        **(Against All Defendants)**

6    162.   Plaintiff repeats and realleges each and every allegation set forth in the

7    preceding paragraphs of this Complaint.

8    163.   At GPN's request and with its knowledge, Plaintiff, through Vanech,

9    provided valuable services and conferred benefits—including sourcing and securing

10   Mr. Hand Pay, providing confidential strategies and contacts, and delivering player

11   traffic—that GPN accepted and retained, all without paying Plaintiff the cash that

12   was owed.

13   164.   Because the Agreement was in fact terminated which Defendants

14   admit, it would be unjust for GPN to then retain the benefits it procured via fraud

15   without paying the reasonable value thereof, which the Agreement outlines the

16   reasonable value of those services by Plaintiff.

17   165.   Plaintiff is entitled to restitution/disgorgement damages in an amount

18   according to proof at trial and caused by Defendants.

19   166.   Defendants are jointly and severally liable for being unjustly enriched

20   by their fraudulent conduct.

21                          **SIXTH CAUSE OF ACTION**

22              **(Violation of California's Unfair Competition Laws -**

23              **Business & Professions Code § 17200, et seq.)**

24                        **(Against All Defendants)**

25   167.   Plaintiff repeats and realleges each and every allegation set forth in the

26   preceding paragraphs of this Complaint.

27   168.   California law prohibits unfair competition.  The unfair competition

28   law (Bus. & Prof.Code, § 17200 et seq.) prohibits unfair competition, which is

defined as "any unlawful, unfair or fraudulent business act or practice ...." (§ 17200.) "Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent." *Shvarts v. Budget Grp., Inc.*, 81 Cal. App. 4th 1153, 1157, 97 Cal. Rptr. 2d 722, 725 (2000).

169.   Plaintiff alleges facts showing that the plaintiff: (1) suffered an injury in fact from relying on Defendant's fraudulent inducement (2) lost money and Trade Secrets, and (3) that such losses were caused and occurred as a result of the unfair competition by Defendants.

170.   To assert a cause of action under Section 17200, Plaintiff alleges that the business practices in question are either unlawful, unfair and/or fraudulent.

171.   Defendants, and each of them, have engaged in unfair competition within the meaning of California Business & Professions Code § 17200 et seq. (the "UCL") through unlawful, unfair, and fraudulent business acts and practices arising from their pre-Agreement and post-termination Agreement conduct, including misappropriation and use of Plaintiff's confidential Trade Secrets, influencer pipeline, contacts, pricing benchmarks, conversion scripts, and CAC/LTV models; deception during and after negotiations; and retention of benefits conferred without compensation.

172.   Plaintiff has lost money or property and suffered economic injury as a result of Defendants' conduct, including but not limited to: (a) costs and resources expended to develop and disclose Plaintiff's Trade Secrets and to procure high-profile influencers (including Mr. Hand Pay); (b) diversion of business opportunities; (c) identifiable revenues and value unjustly retained by Defendants that are attributable to Plaintiff's Trade Secrets and influencer procurement; and (d) loss of goodwill and competitive positioning.

173.   Plaintiff seeks restitution of money and/or property in which Plaintiff has a vested interest and that Defendants obtained through their unlawful, unfair, and fraudulent practices.

174.   Defendants' violations of these statutes and policies constitute "unlawful" business acts and practices under § 17200.

175.   Defendants' acts and practices are unlawful because they borrow violations of, and are tethered to legislatively declared policies in, *inter alia*:

a. The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 et seq. (misappropriation and use of trade secrets);

b. California's Uniform Trade Secrets Act ("CUTSA"), Civ. Code §§ 3426–3426.11 (same, as a predicate and policy tether); and

c. California deceit statutes, Civ. Code §§ 1709–1710 (intentional misrepresentation/promissory fraud).

176.   Defendants' acts and practices are unfair under multiple accepted tests:

a. Balancing test: The harm to Plaintiff (misappropriation of nonpublic pipeline/contacts and conversion tactics; appropriation of Plaintiff-procured influencers and resulting revenues) outweighs any utility of Defendants' practices, which served primarily to shift value without compensation.

b. Tethering test: The practices are tethered to legislatively declared policies protecting trade secrets (DTSA) and prohibiting misappropriation and deception; Defendants' conduct undermines those policies.

c. FTC § 5 test: The injury is substantial, not reasonably avoidable by Plaintiff once Defendants accepted and used the confidential materials and influencer procurement, and is not outweighed by countervailing benefits to consumers or competition.

177.   Defendants' acts and practices are fraudulent because these acts were likely to deceive reasonable business counterparties and members of the public, including by: (a) representing that the parties were "signed and done," that

Defendants would "honor these deals," and that Plaintiff would be paid if the campaign proceeded; (b) continuing to solicit and use Plaintiff's confidential pipeline and playbooks; and (c) withholding payment while concealing post-termination use of Plaintiff's Trade Secrets and the benefits derived therefrom.

178.   Plaintiff reasonably relied on and was likely to be deceived by these representations and omissions.

179.   Under § 17203, Plaintiff seeks restitution of money and property wrongfully obtained by Defendants through the above practices and in which Plaintiff has a vested interest, including identifiable revenues and value attributable to Mr. Hand Pay and other influencers procured through Plaintiff's efforts and Trade Secrets, in amounts to be proven at trial; and a constructive trust over the same.

180.   Plaintiff also seeks injunctive relief to (a) prohibit Defendants from using or disclosing Plaintiff's Trade Secrets and confidential information; (b) require return/destruction of such information and preservation of evidence; (c) enjoin further deceptive practices regarding compensation and use of confidential pipelines; and (d) require an accounting sufficient to effect restitution. Plaintiff has no adequate remedy at law for ongoing and future harm.

181.   Plaintiff additionally seeks attorneys' fees and costs where permitted (including under Code Civ. Proc. § 1021.5, if applicable), and any further relief the Court deems just and proper under § 17203.

**SEVENTH CAUSE OF ACTION**

**(Accounting)**

**(Against Defendant Game Play Network, Inc.)**

182.   Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs of this Complaint.

183.   A relationship existed between the Plaintiff and Defendant GPN that requires an accounting of qualified players signed up through Mr. Hand Pay and net gaming revenue from those players.

184.   Plaintiff alleges that a balance is due to Plaintiff that can only be ascertained by an accounting from Defendant GPN.

185.   Defendant GPN has possessed, managed, and/or controlled money and property in which Plaintiff has a right based fraud and/or unjust enrichment. The precise balance due to Plaintiff cannot be ascertained without an accounting because the relevant amounts are contained in Defendant GPN's books and records, which are not available to Plaintiff.

186.   Legal remedies are inadequate given the complexity and Defendant's exclusive control of the records. Plaintiff seeks a full accounting of all receipts, disbursements, and net player revenue beginning January 2025 (when the Hand Pay Agreement was executed), and judgment for the amount found due.

187.   Plaintiff made a demand for accounting on numerous occasions, including on August 19, 2025.

## VII. RELIEF REQUESTED

Wherefore, Plaintiff prays for judgment against Defendants as follows:

     i.  Judgment for Plaintiff and against Defendants on all causes of action;

    ii.  An order enjoining any arbitration pending the Court's arbitrability decision;

   iii.  Injunctive relief under 18 U.S.C. § 1836 enjoining use/disclosure of Plaintiff's Trade Secrets and requiring return or destruction of same and enjoining any arbitration of these disputes pending the Court's arbitrability decision;

   iv.  Constructive trust over all revenues, profits, and property traceable to Defendants' misappropriation of the Trade Secrets and unfair

competition under California Business & Professions Code § 17200, et seq;

v. An accounting of qualified players signed up through Mr. Hand Pay and any influencer sourced net gaming revenue (NGR) of reasonable value player (which is a fact question) from the effective date of the Hand Pay Agreement through final adjudication of Plaintiff's claims herein and net gaming revenue (NGR) of the reasonable value in year two of revenue, which are the fair market value of damages;

vi. Plaintiff's reasonable value of the benefits conferred on GPN, including the value of player acquisitions, revenue, and CAC savings realized by Defendants attributable to Plaintiff's services and information and a full accounting of players and revenue attributable to Mr. Hand Pay and other RWV-sourced influencers since January 2025;

vii. Compensatory damages (including fraud and reliance damages) in an amount to be proven at trial;

viii. Restitution/disgorgement for unjust enrichment;

ix. Exemplary damages under DTSA and punitive damages for fraud;

x. Attorneys' fees and costs as permitted by law, including under 18 U.S.C. § 1836(b)(3)(D), Business & Professions Code § 17200, et **seq** and, for fraud as well as pre- and post-judgment interest;

xi. Pre-judgment interest at the maximum legal rate, from the date of breach until the time of trial under California Civil Code § 3287;.

xii. Such other and further relief as the Court deems just and proper.

## VIII. JURY TRIAL DEMANDED

188.  Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a trial by jury of all the claims asserted in this Complaint so triable.

Dated: September 18, 2025

Respectfully submitted,

**DUNCAN FIRM, P.A.**

*/s/ James H. Bartolomei III*
James H. Bartolomei III

*Attorneys for*
*Plaintiff RWV LLC*