INFLUENCER SERVICES AGENT AGREEMENT

This Influencer Services Agent Agreement (this "Agreement") is entered into as of this September 30 , 2024 (the "Effective Date"), by and between Horseplay / Game Play Network Inc ("GPN") and RWV LLC. RWV LLC./Robert W. Vameoh ("Agent") in connection with Influencer providing marketing and promotional services on GPN's behalf pursuant to the terms hereof.

1. <u>Services</u>. During the Term (as defined in Section 10 below), Agent shall secure influencer(s) (influencers secured by Agent are referred to as "Creators") to create content to market and promote GPN's goods and services (collectively, the "Products") on one or more social media platforms ("Platforms") pursuant to the terms hereof and the attached statement(s) of work ("SOW") (collectively, the "Services"). The Products subject to this Agreement are listed in the SOW. Agent will provide the Servies in a first-class, professional manner, pursuant to applicable industry standards and the terms hereof.

2. <u>Compensation</u>. GPN agrees to provide Agent as full and complete consideration for the Services with the compensation details set forth in the SOW.

3. <u>Confidentiality</u>.
    (a) Neither party (each, a "Receiving Party"), along with its directors, officers, employees, agents, advisors, subcontractors, independent contractors, subsidiaries, and affiliates (collectively its "Representatives") shall, during the Term and for a period of five (5) years thereafter, without the other party's (each, a "Disclosing Party") prior written approval in each instance, not to be unreasonably withheld, disclose or otherwise make available to any other person or entity (whether acquired on the Effective Date or during the continuance of this Agreement) any information relating to the Disclosing Party's business plans, products, advertising, innovations, fees, advertising or product concepts, customers, technology, computer software, computer systems, marketing methods, sales margins, cost of goods, cost of materials, capital structure, operating results, or other business affairs (including, the Fees and the remainder of the terms hereof), or any other proprietary or confidential information of the disclosing party (the "Confidential Information"). The foregoing shall not apply to Confidential Information which: (i) is or becomes known to the general public other than as a result of the disclosure, directly or indirectly, by the Receiving Party or its Representative; (ii) was or is made available to the Receiving Party on a non-confidential basis from a source other than the Disclosing Party or any affiliate, provided that such source is not, and was not, to the Receiving Party's actual or constructive knowledge, bound by a confidentiality agreement with the Disclosing Party or any affiliate or otherwise prohibited from transmitting such information; or (iii) is required to be disclosed by law, provided the Receiving Party gives the Disclosing Party notice and an opportunity to seek an appropriate protective order at its own expense. It is understood that the information required to be held in confidence as herein provided may be disclosed by the Receiving Party only to Representatives who need to know such Confidential Information for the purposes of fulfilling its obligations hereunder. Such Representatives, prior to any such disclosure, shall be informed of the confidential nature of such Confidential Information, and shall agree, in writing, to be bound by the terms hereof.
    (b) All Confidential Information furnished to the Receiving Party by the Disclosing Party or any third party at the request of the Disclosing Party shall be and remain the

1

        property of the Disclosing Party. All copies of such Confidential Information in written, graphic, or other tangible form shall be returned to the Disclosing Party at any time upon the advance written request of the Disclosing Party or upon the termination or expiration of this Agreement for any reason whatsoever, subject to the terms hereof.

    (c)    The confidentiality provisions set forth herein shall also apply separately to each employee, subcontractor, or independent contractor engaged hereunder, and the engaging party shall be responsible for informing any such employee or contractor of any confidential and proprietary information included in any work contracted for hereunder. The engaging party shall require each such employee or contractor to agree to be bound in writing by confidentiality terms no less stringent than those set forth herein.

4. <u>Mutual Representations and Warranties</u>. Each party represents and warrants that it is duly organized, validly existing, and in good standing in its state of incorporation, and has the full power and authority to enter into this Agreement and fulfill its obligations hereunder. Each party further represents and warrants that all information and materials created or provided by such party hereunder, to the best of such party's actual or constructive knowledge: (i) are true and accurate in every respect; (ii) do not violate any applicable law, rule or regulation (including all applicable advertising regulations); and (iii) do not violate any third party right of any person or entity in any way, including, any intellectual property, privacy, defamation, or publicity right.

5. <u>Indemnification</u>. Each party (each, the "Indemnifying Party") agrees to indemnify, defend, and hold the other party (each, the "Indemnified Party"), along with the Indemnified Party's affiliates, officers, directors, employees, subsidiaries, parent, agents, and permitted assigns, harmless from and against any and all third party claims, losses, liabilities, damages, expenses, and costs, including reasonable outside attorneys' fees and court costs, to the extent arising out of the Indemnifying Party's: (i) negligence or willful misconduct; or (ii) material breach of any of the terms of this Agreement. The Indemnified Party shall provide the Indemnifying Party with prompt written notice of any claim and give complete control of the defense and settlement to the Indemnifying Party, and shall reasonably cooperate with the Indemnifying Party, its insurance company, and its legal counsel in its defense of such claim(s), at the Indemnifying Party's expense. This indemnity shall not cover any claims in which there is a failure to give the Indemnifying Party prompt notice, to the extent such lack of notice prejudices the defense of the claim. The Indemnifying Party may not settle any potential suit hereunder without the Indemnified Party's prior written approval, not to be unreasonably withheld, conditioned or delayed.

6. <u>Limitation on Liability</u>. EXCEPT FOR THE PARTIES' RESPECTIVE INDEMNIFICATION OBLIGATIONS HEREUNDER, IN NO EVENT SHALL EITHER PARTY BY LIABLE UNDER THIS AGREEMENT TO THE OTHER PARTY FOR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT, STATUTORY, SPECIAL, EXEMPLARY OR PUNITIVE DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, LOSS OF USE, LOSS OF TIME, INCONVENIENCE, LOSS BUSINESS OPPORTUNITIES, DAMAGE TO GOOD WILL OR REPUTATION, AND COSTS OF COVER, REGARDLESS OF WHETHER SUCH LIABILITY IS BASED ON BREACH OF CONTRACT, TORT, STRICT LIABILITY OR OTHERWISE, AND/OR EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. EACH PARTY'S AGGREGATE LIABILITY FOR ANY CLAIMS RELATING TO THIS AGREEMENT WILL BE LIMITED TO AN AMOUNT EQUAL TO THE SUM OF THE FEES PAID BY

GPN TO AGENT HEREUNDER. ANY CLAIMS MADE PURSUANT TO THIS SECTION MUST BE MADE WITHIN ONE YEAR OF THE INCIDENT TO WHICH THEY RELATE OR FOREVER BE BARRED.

7. <u>Term and Termination</u>.

    (a) <u>Term</u>. Except as otherwise provided for in an SOW, this Agreement shall have a term of one year ("Initial Term") which shall automatically renew for additional one year renewal periods (each a "Renewal Term") unless terminated by a party upon no less than 30 days prior written notice before the expiration of the then current Initial or Renewal Term (individually and collectively, the "Term").  Either party may terminate this Agreement with 24 hours prior written notice to the other party which is the cancellation of all new work, etc. Anything that comes from an influencer prior to the Termination date who becomes a qualifying player within 60 days will receive full recognition and compensation.  Visitors that arrive after the Termination date and later convert are not covered (standard affiliate terms).

    (b) <u>Termination For Cause</u>. This Agreement may be immediately terminated by either party without liability if: (i) the other party violates any applicable U.S. state or local law, rule, regulation, or ordinance (including, any applicable advertising regulation); (ii) the other party otherwise materially breaches any provision, warranty, or representation of this Agreement and, if such breach or violation is curable, it remains un-remedied for a period of 30 days following receipt of written notice thereof detailing such breach or violation; (iii) the other party becomes insolvent, makes a general assignment for the benefit of its creditors, suffers or permits the appointment of a receiver for its business, or becomes subject to any proceeding under bankruptcy laws or any other statute or laws relating to the insolvency or protection of the rights of creditors; or (iv) the other party engages in behavior which a reasonable person would consider harassing, defamatory, incendiary, racist, prejudiced, or otherwise offensive.

8. <u>Assignment</u>. Neither party may assign or otherwise transfer this Agreement, in whole or in part, without the prior written consent of the other party, such consent not to be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, Agent shall be free to assign this Agreement to any: (i) affiliate of Agent; or (ii) successor entity of Agent that assumes all, or a majority of, Agent's assets in writing. Any assignment in violation of this clause shall be null and void.

9. <u>Notices</u>. All notices and other communications hereunder (each, a "Notice") shall be made in writing and addressed to the parties at their respective addresses as set forth herein or otherwise as designated in writing by the receiving party. All Notices shall be delivered either by a nationally recognized overnight courier, personal delivery, confirmed email, or certified or registered mail. Except as otherwise provided herein, a Notice is effective upon receipt by the receiving party or for Notices delivered via email, receipt by the sender of electronically generated confirmation of delivery.

10. <u>Relationship of the Parties</u>. The parties hereto are independent contractors and as such, at no time shall either party be considered an employee or employer of the other. Without limiting the generality of the foregoing, neither party may bind the other party to any agreement, obligation, or covenant of any kind, expressed or implied, without the bound party's prior written consent in each instance.

11. <u>Survival</u>. Following the Term, all provisions set forth herein which, by their very nature, are intended to survive any expiration or termination hereof, shall so survive, including the provisions respecting confidentiality, representations & warranties, non-compete, non-solicitation, indemnifications, limitations on liability, insurance, ownership, and accrued payment obligations.

12. <u>Dispute Resolution</u>. Both parties specifically acknowledge, agree and consent that any suit, action, proceeding, dispute, controversy or claim ("Dispute") arising out of or relating to this Agreement will be dealt with in accordance with the following procedures. All parties shall first attempt to negotiate all Disputes informally for at least thirty (30) days before initiating any arbitration. The parties shall use their best efforts through his informal process to settle any Dispute and engage in good faith negations. Such informal negotiations shall commence following the receipt of a notice in writing by one of the parties sent to the other. GPN will send its notice to Agent's email address Agent provided. Any notice to GPN shall be sent to the address listed below. If the Dispute is not resolved through informal negotiations, the Dispute (except those Disputes expressly excluded below) shall be finally and exclusively resolved by binding arbitration before a sole arbitrator in Los Angeles, California in accordance with the Streamlined Rules of the Judicial Arbitration and Mediation Services ("JAMS"). The current Streamlined Rules of JAMS are available here: http://www.jamsadr.com/rules-streamlined-arbitration/. If the parties cannot agree on an arbitrator, the selection process of JAMS shall apply. The party seeking to bring a claim under this Arbitration Provision must demand arbitration in writing and deliver the written demand, with an original physical signature, by hand or first class mail to the other party (the "Demand for Arbitration"). Any Demand for Arbitration submitted with a digital, electronic, copied, or other non-original signature will be null and void. The Demand for Arbitration shall include an identification of the parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any Demand for Arbitration made to GPN shall be provided to by U.S. Mail, or by any nationally recognized delivery service (e.g., UPS, Federal Express, etc.), or by hand delivery to the address listed below. YOU UNDERSTAND THAT ABSENT THIS PROVISION, YOU WOULD HAVE THE RIGHT TO SUE IN COURT AND MAY HAVE RIGHT TO REQUEST A JURY TRIAL. The determination of whether a Dispute is subject to arbitration shall be governed by the Federal Arbitration Act and determined by an arbitrator rather than a court. The prevailing party in any arbitration or other proceeding arising under these Terms of Use shall be entitled to receive reimbursement of his, her or its reasonable expenses (including reasonable attorneys' fees, expert witness fees and all other expenses) incurred in connection therewith. Judgment upon the award so rendered may be entered in a court having jurisdiction or application may be made to such court for judicial acceptance of any award and an order of enforcement, as the case may be. Notwithstanding the foregoing, each party shall have the right to institute an action in a court of proper jurisdiction for injunctive or other equitable relief pending a final decision by the arbitrator. To the full extent permitted by law: (1) no arbitration shall be joined with any other; (2) there is no right or authority for any Dispute to be arbitrated on a class-action basis or to utilize class action procedures; and (3) there is no right or authority for any Dispute to be brought in a purported representative capacity on behalf of the general public or any other persons.

13. <u>Jurisdiction, Choice of Law and Attorneys' Fees</u>. To the extent not covered by the Dispute Resolution provisions above, any disputes between the parties arising out of or related to the Services or these Terms of Use shall be subject to the exclusive jurisdiction and venue of the federal and state courts located in the State of California, County of Los Angeles and shall be governed by, and will be construed under, the law of the United States of America and the

law of the State of California, without regard to choice of law principles, regardless of where the parties reside. Both parties agree to accept service of process by mail, and hereby waive any and all jurisdictional and venue defenses otherwise available. The application of the United Nations Convention on Contracts for the International Sale of Goods is expressly excluded. EACH OF THE PARTIES IRREVOCABLY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT.  The prevailing party shall receive reimbursement of his, her or its reasonable expenses (including reasonable attorneys' fees, expert witness fees and all other expenses) incurred in connection therewith.

14. <u>General Provisions</u>. If any part or portion of this Agreement is deemed to be invalid and therefore unenforceable, the remaining provisions shall continue in full force and effect. No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same of other provisions of this Agreement. If any term, clause, or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause, or provision and such invalid term, clause, or provision shall be deemed to be severed from the Agreement. This Agreement is the entire agreement between the parties with respect to its subject matter and supersedes any prior agreement or communications between the parties, whether written or oral relating hereto. No representation, inducement, or promise has been made or relied upon by either party, unless expressly set forth in this Agreement. This Agreement may be modified only by a written amendment signed by parties. To the extent that the terms hereof contradict and terms of any attachment hereto, the terms hereof shall govern, unless specifically set forth to the contrary therein. This Agreement may be executed in counterparts, both of which shall be deemed one and the same instrument and may be executed and transmitted to any other party by facsimile, which facsimile shall be deemed to be, and utilized in all respects as, an original, wet-inked manually executed document. Signatures provided by facsimile transmission or in PDF format sent by electronic mail shall be deemed to be original signatures. The headings contained in this Agreement are for convenience only and shall have no operative effect.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

HORSEPLAY/GAME PLAY NETWORK, INC.

By: *Russell Fine*

Title: President

RWV LLC.
ROBERT W. VANECH

By: *Robert W. Vanech*

Title: President

Statement of Work #1

This Statement of Work #1 ("**SOW #1**") is governed by the Influencer Services Agent Agreement dated September 30 , 2024 (the "Agreement"). All terms shall have the same meanings as in the Agreement. If there is any conflict between the terms of the Agreement and the SOW, the terms of the SOW shall prevail.

1. <u>Definitions</u>.

    "**Player**" means persons that access the GPN Products through a link or code provided by GPN to an Influencer;

    "**Qualified Player**" is defined as a new, unregistered Player delivered by an Influencer as determined by the link or code provided by GPN, that has generated Net Gaming Revenue to GPN of a minimum of $150.00 within 120 calendar days of signing up as a Player.

    "**Gross Gaming Revenue**" or "**GGR**" means the revenue earned by GPN in respect of Player horse race wagers placed from the GPN Product, including but not limited to the "takeout" (or "commission"), hub fees earned from the wagers, and net breakage, net of cancelled wagers, refunds and other direct wagering related costs and expenses; less (i) RTP Enhancements; less (ii) Liquidity Costs;

    "**Liquidity Costs**" means those payments made by the GPN into Player pools directly, and/or into company or other accounts used to wager into pools to (i) provide or increase the liquidity within a particular game or pool and/or (ii) to adjust the behaviour of wagering pools;

    "**RTP Enhancements**" means those funds given or made available to Players either directly or through freeplay (or equivalent) or wagers or 'wager winnings', whose purpose is to enhance/adjust the return experienced by a Player (irrespective of whether or not such Player is aware that, or is aware of the format in which, s/he has received any such enhancement or adjustment);

    "**NGR**" or "**Net Gaming Revenue**" means Gross Gaming Revenue less (i) Racing Industry Fees; less (ii) Player Costs; less (iii) Player Development Bonuses and Player Acquisition Bonuses less (iv) Gaming Taxes. GPN may calculate certain or all of the foregoing deductions by territorial segments (e.g. on a per-State basis) and/or by means of reasonable and appropriate formulaic allocation among certain or all GPN Products and/or Players;

    "**Racing/Industry Fees**" means pool guarantees, racing content-related fees, host fees, data fees, tote and other processing fees and/or fees paid by GPN to third parties pursuant to its or their respective racing partner agreements;

    "**Player Development Bonuses**" means those bonuses, offers, tournaments or incentives made available to existing Players to promote repeat play and Player optimization;

6

"**Player Acquisition Bonuses**" means any player incentive payments, including "free money", "free bets", "free games", "money back", "top-ups", bonuses, loyalty costs, discounts, and promotional items that are made available by GPN to new Players to incentivise them to register and deposit on the respective GPN Products;

"**Player Costs**" means, with respect to all Players, those onboarding and deposit processing expenses related to (i) payments made by the GPN for payment processing expenses, including any charges levied by electronic payment or credit card organisations; (ii) any manual adjustments or credits to a Player's account; (iii) bad debts and monies attributable to fraud; and (iv) transactions which are reversed by instruction from the card-holder's bank or payment processor (commonly referred to as 'charge-backs'); but will not include iv) payments made by GPN to unaffiliated third parties for player identification, verification, security, 'Know Your Customer' and related services; and (vi) payments made by the GPN to unaffiliated third parties for geo-location, geo-fencing and other similar services in respect of the GPN Products;

"**Gaming Taxes**" means any and all fees, duties, levies, taxes and charges, including source market fees, directly incurred in relation to the operation of each GPN Product and its online gaming services by GPN, which are charged by any governmental or Regulatory Authority, be it on provincial, local or federal level, in the territory where GPN Products is made available to Players, and whether such fees, duties, levies, taxes and charges are charged by reference to turnover or profitability or as fixed charges or otherwise (but excluding, for the sake of clarity, taxes for personnel or corporate income tax or similar) and whether the same are payable to such governmental or Regulatory Authority or to any other third party as directed by any governmental or Regulatory Authority;

"**Regulatory Authority**" means the competent regulatory authority (or its competent successor authority, as the case may be) in charge of regulating and supervising gambling and issuing relevant licenses in respect of GPN's activities in the respective territory;

2. Services by Agent.  Agent will provide the following Services to GPN as a non-exclusive provider of obtaining Influencer services.

3. Influencers.
    a. Mr. Hand Pay
    b. Other influencers as mutually agreed upon by the parties in writing.

4. Platforms.  YouTube, TikTok, Instagram, Snapchat, and other social media promotions.

5. Deliverables.  Agent shall obtain written agreement by Influencer to promote GPN's Products through direct commentary and publication of pre-approved creative via their social channels.

6. <u>Fee</u>.  GPN will pay Agent as follows based on Qualified Players delivered by the Influencers as determined by the link or code provided by GPN.

   i. For each Qualified Player as defined herein, Agent receives a bounty of $37.50.
   ii. 15% of the NGR that Qualified Player generates in the its first 365 calendar days of engagement with GPN, beginning on the day that Qualified Player is approved to play.
   iii. 10% of the NGR generated in the second 365 calendar days of the Qualified Player's engagement with GPN (days 366-730).

7. <u>Buyout</u>.  If by September 30, 2025, the NGR percentage payment for the prior three calendar months (July 2025/August 2025/September 2025) is less than $30,000, GPN has the right, but not the obligation, to buy out all remaining NGR payments to Agent for six times the average monthly payment for the time period of July 2025/August 2025/September 2025.

   For example:  If the payments due for July 2025, August 2025 and September 2025 were $18,000 in total, GPN has the right, but not the obligation, to make a one-time payment of $36,000 (($18,000/3) *6 ) to buy out all remaining NGR royalty payments to Agent and terminating Agent's NGR share.

8. <u>Warrant</u>.  GPN shall issue and deliver to Agent a warrant granting Agent the right to purchase Ten Thousand (10,000) shares of GPN's common stock at the exercise price of $4.00 per share (the "Warrant") for each One Thousand Qualified Players delivered by Agent by December 31, 2024. The Warrant shall vest immediately. The Warrant shall contain the following additional terms: (i) the Warrant shall be exercisable in the 5-year period following the effective date of the Warrant.  In the event that this Agreement is terminated for cause by GPN under Section 7 of the Agreement, this Warrant shall be cancelled and terminated.
9. <u>Marketing Fee</u>. For each influencer signed by Company, a $5,000 marketing fee will be paid for services to RWV, LLC, its designee of choice, or to the influencer within 15 days of contract signing to enable promotion and marketing of Company services.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.


HORSEPLAY/GAME PLAY NETWORK, INC.    RWV LLC, ROBERT W. VANECH

By: *Russell Fine*                    By: *Robert W. Vanech*


Title: President                      Title: President

8